**In the Interests of M.W., T.W., and J.W., Minor Children.**

**Appeal of C.O.**

**No. 89–242.**

Supreme Court of Iowa.

July 18, 1990.

John W. Kocourek of Peterson Law Offices, Council Bluffs, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Charles K. Phillips, Asst. Atty. Gen., for appellee.

Considered by LARSON, P.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN, JJ.

CARTER, Justice.

C.O., the natural mother of M.W., T.W., and J.W., appeals from an order of the juvenile court terminating her parental rights as to all three of these minor children. The court of appeals reversed the juvenile court's order, and we have granted further review.

This case involves three children: a boy born in March 1980, a girl born in April 1981, and a boy born in April 1982. All three children have the same mother; the two older children have the same father, while the youngest child has a different father. None of the children have had any substantial contact with the natural fathers for several years.

The mother and children have received services from the Department of Human Services (DHS) since 1981. The children have been in and out of foster placement since that time. In recent years, all three children have been continuously placed outside the mother's home. The oldest child has been in foster care continuously since January 1984, the middle child since July 1986, and the youngest child since September 1986.

The concerns leading to foster care placement included the following: (1) severe physical abuse of all three children by a stepfather; (2) severe sexual abuse of two of the children by the same stepfather; (3) the mother's repeated unstable and short-term relationships with violent men; (4) the mother's severe neglect of the children, which sometimes forced the children to wander the streets in search of food; (5) the mother's inability to maintain a stable residence or stable job; and (6) the mother's lack of insight into the children's special needs, and her refusal to cooperate with social workers.

I. *The Children.*

In reviewing the numerous child abuse reports, caseworker reports, psychologist reports, medical reports, and other DHS documents in the record, it is clear that the children have significant emotional and behavioral problems which will require long-

term therapy and family counseling, irrespective of their eventual placement.

T.W. has received continual foster care services since 1984, and M.W. and J.W. since 1986. The children initially experienced a number of traumatic short-term placements which were necessitated due to the foster parents' inability to cope with their behaviors such as extreme hyperactivity, destruction of toys and property, inappropriate sexual demonstrations, and an inability to respond to discipline or authority. The children had few social skills, they could not relate appropriately to peers or adults, and at one time it was felt all the children might require residential care before foster care could be successful.

The children were finally separated and placed in therapeutic foster homes where they began to stabilize their behavior, form attachments, and develop appropriately.

In addition to foster care services, each child has been receiving individual psychotherapy from several different doctors and psychologists. The principal therapist since 1986 for T.W. and M.W. has been Dr. Beischel. Dr. Beischel has seen J.W. since 1987. In September 1987, M.W. began to see Kerri Fitzpatrick, because it was felt she needed a female therapist.

According to the most recent DHS report issued December 1989, the children have indicated in their therapy sessions that C.O. was far more involved in their physical and sexual abuse than originally known by the DHS. The children have continued, particularly M.W. and T.W., to verbalize a fear of their mother and are afraid of visits or being returned to her. The children have had visits with each other, but they have not gone well. During one visit, the two boys killed a guinea pig and a squirrel. There has been more than one incident of fire setting, the children require strict supervision by a number of adults while together, and the DHS has observed sexual acting out behaviors when all three children are together.

II. *The Mother.*

The mother, C.O., became pregnant with T.W. at age sixteen. Her early years as a mother are characterized as chaotic and fraught with substance abuse problems, employment inconsistency, impoverished living conditions, and a propensity to engage in relationships with men who were physically abusive and alcohol dependent. Throughout her children's early lives, she demonstrated a lack of judgment in caring and providing for them. As the court of appeals put it, "[s]he failed quite miserably as a parent."

Since coming under the supervision of the DHS and the juvenile court, C.O. has been required to participate in parenting classes, in-home supervision, psychological counseling, and numerous other services. Although at times she displayed interest and commitment to participation in programs that will lead to the return of her children, her interest and efforts have been sporadic. There are many references in DHS records to missed appointments, missed visitations with the children, and failure to comply with case permanency plans. C.O. has exhibited a distrust and resentment toward state agencies and blames "the system" for her troubles with her children. These feelings were expressed in her interviews with two therapists who evaluated her prior to the most recent hearing in December 1989.

At a hearing in 1987, C.O. claimed to have completed an associate of arts degree. She also claimed to have stable employment and residency; however, statements made at her contemporaneous eviction hearing refute those assertions. The juvenile court in its recent order affirming the termination noted that C.O. has given varying accounts of the jobs she has held and can provide no corroborating evidence concerning her employment history. C.O. is currently not working.

C.O. admits to a history of alcohol abuse but claims that she has corrected the problem through the assistance of Alcoholics Anonymous and with the support of her husband. She has apparently maintained her sobriety for about two years. Since getting married, however, C.O.'s attendance at Alcoholics Anonymous meetings has been infrequent. She stated in the

December 1989 hearing that she had only been to two meetings in the past year.

C.O. attributes J.W.'s emotional instability to his foster care treatment, the changing of placements from home to home, and the lack of consistent contact with the mother due to the overzealous nature of the DHS. At the time this case initially went up for appeal, C.O. recognized that T.W. may need ongoing therapy and care beyond her ability to provide, and acknowledged that T.W. and M.W. should be put up for open adoption. In her appeal brief, C.O. frames her entire argument with regard to J.W. but does add that it applies equally to the other two children. In the subsequent hearing held in December 1989, C.O. indicated that she no longer feels that T.W. and M.W. have problems that are too great for her to handle.

Prior to the hearing on remand, C.O. was examined by a licensed psychiatrist and psychologist. The psychologist, Dr. Theodore J. DeLaet, found no signs of psychotic behavior. He determined she had a troubled childhood, resists disclosing her emotional distress to others, and is a very emotional person. He found she does not show an active mental disorder, but does have personality disorders. She finds it difficult to trust others and has a tendency to disassociate herself from life's unpleasant things. He found her emotionally stable at the present time, but was unable to assess, through interviews and testing, her fitness as a parent. He recognized the emotional problems faced by the children and the greater difficulty in managing them as compared to other children. He indicated that C.O. might have a difficult time cooperating with in-home supervision and might perceive this to be intrusive. He noted that she is significantly distrustful of state agencies and would find it difficult to cooperate with "the system."

The psychiatrist, Dr. Michael Sedlacek, detected no overt thought disorder and observed nothing in her manner or behavior or the presentations that suggested any psychiatric problems. He formed the conclusion that C.O. was not properly parented herself, making it more difficult for C.O. to raise a child appropriately, as she has no previous history on which to base decisions.

C.O. was diagnosed in December of 1988 as having Graves' Disease. Her condition was treated by surgery on August 22, 1989, and she is currently being treated by medication. According to expert testimony, Graves' Disease affects a person's emotional stability and judgment skills. Persons with this disorder suffer from mood swings, decreased attention span, and changing anxiety levels. It is uncertain from the evidence how long before treatment C.O. had this problem and what effect it may have had on her. Dr. Sedlacek opined that C.O. could have been suffering from the disorder prior to 1987, but did not know to any degree of medical certainty whether or not Graves' Disease affected her past behaviors.

C.O. met her current husband, R.C., in the summer of 1988. They began living together in the fall of that year and were married in December 1988 after premarital counseling. R.C., age forty-two, is a chief hospital corpsman in the United States Navy, and has served in the Navy since 1966. R.C. is a recovering alcoholic. R.C. has never met the children; however, he has expressed the desire and willingness to take custody of, and ultimately adopt, his wife's three children. His job provides an income of over $40,000, he has adequate housing, and, if the children are in their mother's custody, the children will qualify for the benefits available to dependents of those in the armed forces. He is being transferred to the State of Washington where his duties will include those of chief medical officer on a submarine for two six-week periods annually. At other times he will be home with his wife. The appellant contends that her new husband has contributed greatly to her stability.

III. *Prior Proceedings.*

The termination petition was filed on June 23, 1988. Hearing was held on August 25 and 28, 1988. At the hearing, both the DHS and Dr. Beischel, a family therapist assigned to the case by the juvenile court, recommended termination. Termi-

nation was ordered on December 28, 1988. In January of 1989, appellant filed a motion for new trial and a motion to submit new evidence based upon C.O.'s latest marriage and upon the discovery that she has Graves' Disease. This motion was denied on January 17, 1989. C.O. appealed the termination.

In October of 1989, the court of appeals ordered that this case be remanded for further evidence. *In re T.W.W., Jr., M.K.W. & C.J.W.*, 449 N.W.2d 103 (Iowa App.1989). The State's petition for further review of this order was denied. After additional evidence was taken at a December 1989 hearing, the court on January 19, 1990, affirmed its previous order. The termination of parental rights order was again appealed, and on February 22, 1990, the court of appeals reversed the order issued in December 1988 and affirmed in January 1990. The court of appeals concluded that C.O. has made substantial progress in stability and maturity and has recently married a responsible man whose military position makes substantial financial and medical benefits available to C.O.'s children which were not available in the past through her own resources. It concluded that these circumstances were sufficient to forestall the termination of the parent-child relationships for the present time.

### IV. *Disposition on Further Review.*

In reaching its decision, the court of appeals tacitly acknowledged that the children probably continue to meet the definitional criteria for children in need of assistance under Iowa Code section 232.-2(6)(c)(1)–(2), (f) (1989). We believe that this circumstance militates against the reversal of the juvenile court's order.

■ Statutory criteria for determining whether a child shall be removed from the home include the following:

> the child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance and an adequate placement is available.

Iowa Code § 232.102(4)(b). We believe that similar considerations must be applied in determining whether the child may safely be returned to the home. If this standard is applied in the present case, it supports the action of the juvenile court in terminating C.O.'s parental rights in December 1988 and again in January 1990.

In *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990) (decided this date), we determined that the grounds for termination of parental rights under section 232.116(5) (1987) (presently codified as section 232.116(1)(e) (1989)) are met if after an adjudication that a child is in need of assistance and placement of the child for the statutory period "the definitional grounds" of section 232.-2(6) continue to exist. Although Iowa Code section 232.116(2) suggests that the primary consideration in termination cases is "the physical, mental, and emotional condition and needs of the child," the legislature, in cases meeting the conditions of section 232.116(1)(e)(1), (2), and (3) (1989), has made a categorical determination that the needs of a child are promoted by termination of parental rights. *See Interest of Dameron*, 306 N.W.2d 743, 744–45 (Iowa 1981).

Because on our de novo review of the record our conclusions accord with those of the juvenile court, we vacate the decision of the court of appeals and affirm the judgment of the juvenile court.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.