## IN THE COURT OF APPEALS OF IOWA

No. 17-0851
Filed September 27, 2017

**IN THE INTEREST OF A.S.,**
**Minor Child,**

**A.S., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Monroe County, William S. Owens, Associate Juvenile Judge.

A mother appeals the termination of her parental rights.  **REVERSED AND REMANDED WITH DIRECTIONS.**

Robert F. Bozwell, Jr. of Bozwell Law Office, Centerville, for appellant mother.

Thomas J. Miller, Attorney General, and Ana Dixit, Assistant Attorney General, for appellee State.

Julie R. De Vries of De Vries Law Office, PLC, Centerville, guardian ad litem for minor child/appellee.

Considered by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

A mother appeals the termination of her parental rights, asserting several claims.  Because we agree, based on the unique facts of the case, that a guardianship should have been created rather than terminating the mother's parental rights, we reverse the juvenile court's termination-of-parental-rights ruling with respect to the mother.  We remand the case back to the juvenile court to enter an order transferring guardianship and custody of the child to the maternal grandparents pursuant to Iowa Code section 232.104(2)(d)(1) (2017).

### I.  Background Facts and Proceedings.

A.S. is the mother and J.S. is the father of A.S., born in 2015.  The family came to the attention of the Iowa Department of Human Services (DHS) in 2016 after it was reported the child had been sexually abused.  Specifically, on February 4, 2016, the mother left the child, then about three months old, in the care of the father, who she knew was intoxicated, for approximately two hours.

> Upon [the mother's] return home, she observed [the father] "passed out" and [the child] crying and shaking in a baby swing.  [The mother] noticed blood coming from [the child's] diaper.  When [the mother] removed the diaper, she noticed injury to [the child's] genitals.  [The mother] took [the child] to the . . . hospital.  Injuries were observed and [the child] was taken to Blank Children's Hospital by ambulance.  [The child] ha[d] suffered injuries from forced sexual abuse.  The injuries required surgery.  [The mother] made statements she didn't want to believe the child's father caused such injuries.

The child was removed from the parents' care and subsequently adjudicated a child in need of assistance (CINA).[1]  The child was placed in the custody of the

---

[1] At the time of the termination-of-parental-rights hearing, the father was in prison, having been found guilty of first-degree sexual abuse and sentenced to life without the possibility of parole.  His parental rights were also terminated, and he does not appeal.

child's maternal grandparents, where the child has since remained.[2] The mother also moved into the maternal grandparents' home and continued to live there throughout the case.

As directed by the juvenile court, the mother saw a psychologist for a mental-health evaluation in May 2016. The psychologist's report that followed advised:

> During [the mother's] schooling, she was in special education services and reported current reading problems. Psychological testing administered during this evaluation placed her intellectual ability in the mildly intellectually disabled/borderline range. Brief screening measures placed her reading and oral comprehension ability at the fourth grade level, with her memory ability in the low average range. . . . [S]he appeared perplexed by more conceptual, open ended questions. Background records indicate that at times she does not understand legal circumstances and the purpose of services provided to her.
>
> . . . .
>
> A less than ideal relationship between [the mother] and her husband, [the father], was described. She was hesitating in describing details about her husband and their relationship, but she did reluctantly acknowledge he called her names and used alcohol. Background records indicate that both of these behaviors occurred with some regularity. Despite these difficulties and the allegations of sexual abuse towards her daughter, she remains committed to this relationship and has a positive appraisal of [the father] and his parenting abilities. Background records also indicate she remains committed to the marriage, and she has visited him regularly while incarcerated.
>
> A number of concerns arose in regard to [the mother's] ability to autonomously care for her young daughter. During this evaluation, she communicated a basic framework of appropriate parenting practices but more sophisticated practices needed further assistance and instruction. She did articulate that it was acceptable to leave her child in the care of an intoxicated individual, as she believed that individual could decide how to take care of a child. Background records indicate that she does not appear to acknowledge the seriousness of the sexual assault and believes

---

[2] The child was placed in the maternal grandparents' legal custody until the court entered its termination-of-parental-rights ruling, where the child was placed in the legal custody of the DHS.

that her husband did not carry out such behavior as he informed her of this. Background records indicate that she does appear to have a bond with her daughter, but relatives have expressed concerns about her ability to care for a young child and there have also been previous concerns about maintaining appropriate caloric intake for her daughter. In sum, [the mother] may appear well-intentioned in regard to the welfare of her daughter, but at times she does not fully appreciate the complexity of the issues and potential threats to the welfare of her daughter.

The psychologist set forth recommendations for providing the mother services "in an attempt to bolster [her] parental capacity," but the psychologist believed the services could not remedy the mother's difficulties in the long term, given her intellectual disability. The psychologist opined the mother was "likely to require services for a longer period of time until her daughter maturates to a level where she can partially care for her own well-being."

Services were provided to the mother, and the DHS case worker and service providers attempted to tailor those services to accommodate the mother's difficulties as recommended by the psychologist. There is no question the mother fully engaged in the services provided and was generally willing to do anything asked of her for reunification, though she did continue to visit the father in jail for many months after the start of the case. At the end of the day, the DHS case worker and service providers did not believe the mother could safely care for the child on her own due to her intellectual limitations. The DHS, the child's guardian ad litem, and the court-appointed special advocate (CASA) recommended termination of the mother's parental rights. Following a termination-of-parental-rights hearing, the juvenile court agreed and terminated the mother's parental rights pursuant to paragraph (h) of section 232.116(1).

The mother now appeals that ruling. Our review is de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).

## II. Discussion.

Parental rights may be terminated under Iowa Code chapter 232 if the following three conditions are true: (1) a "ground for termination under section 232.116(1) has been established" by clear and convincing evidence, (2) "the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights," and (3) none of the "exceptions in section 232.116(3) apply to preclude termination of parental rights." *Id.* at 219-20. "For evidence to be 'clear and convincing,' it is merely necessary that there be no serious or substantial doubt about the correctness of the conclusion drawn from it." *Raim v. Stancel*, 339 N.W.2d 621, 624 (Iowa Ct. App. 1983); *see also M.W.*, 876 N.W.2d at 219.

The mother's arguments on appeal are intertwined. She contends the State failed to prove the child could not be returned to her care—the fourth element of paragraph (h)—because the mother continued to reside with the child in the maternal grandparents' home and the child was safely cared for there.[3] She similarly argues termination was not in the best interests of the child because she and the child share a bond and live with the maternal grandparents.

---

[3] Under section 232.116(1)(h), the court may terminate the rights of a parent to a child if: (1) the child is three years old or younger, (2) the child has been adjudicated a CINA under section 232.96, (3) the child has removed from the physical custody of the child's parents for at least six of the last twelve months or the last six consecutive months and any trial period in the home has been under thirty days, and (4) "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." "At the present time" refers to the time of the termination hearing. See *In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014). It is not disputed that the first three elements were met. The child was under three, was adjudicated a CINA pursuant to section 232.96, and was removed from the mother's physical custody since February 2016.

She points out that guardianship was a viable alternative to termination of her rights. She also questions whether the court should have granted her additional time "to correct and resolve the [DHS's] concerns," noting her intellectual disability hindered her ability to meet the statutory time-frame for reunification set forth in section 232.116(1)(h) and quoting language from a federal agency bulletin concerning working with parents with disabilities. She maintains reasonable efforts for reunification were not provided to her and the DHS "lulled [her] into believing that she was adequately progressing." She concluded that there was simply no evidence in the record to support termination of her parental rights. While we disagree with most of these assertions, we do believe creation of a guardianship was appropriate under the facts of the case.

First, we dismiss the mother's claims that reasonable services were not provided to her. Though the DHS "has an obligation to make reasonable efforts toward reunification, . . . a parent has an equal obligation to demand other, different, or additional services prior to a permanency or termination hearing," and if the parent does not make a timely request, the issue is not preserved for our review, as is the case here. *See In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002); *In re A.A.G.*, 708 N.W.2d 85, 91 (Iowa Ct. App. 2005). The mother made no such requests, and, in any event, the record demonstrates the DHS provided adequate services in this case.

Next, a child's protection "is one of the most well-established duties and public policies" of this state, and, in relation thereto, it "has a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it. Both [the DHS] and the juvenile court

have the important function of protecting children who are in need of assistance." *In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014) (alterations, internal citations, and quotation marks omitted). "[L]ower mental functioning alone is not sufficient grounds for termination," but it is a relevant consideration if it affects the child's well-being. *A.M.*, 843 N.W.2d at 111; *see also In re Wardle*, 207 N.W.2d 554, 563 (Iowa 1973) ("Ordinarily, mental disability in a parent does not operate in a vacuum so far as the best interest and welfare of his child is concerned but is usually a contributing factor in a person's inability to perform the duties of parenthood according to the needs of his child.").

It is true that the mother did not sexually assault the child and could not foresee the child would be so assaulted by the father, but that is not the issue. The record reveals that even after the DHS became involved, the mother still did not recognize the danger of leaving her child with someone who was intoxicated. The mother did not believe—or did not want to believe—the father did what he did, despite the evidence before her. She even continued to express a desire for her and the child to be in his life after the assault. These positions call into question the mother's overall decision-making ability, her ability to recognize threats to ensure the child's safety, and her ability to put the child's needs before her own. The mother's statements, coupled with everyday issues that existed at the beginning of the case when she was on her own, like whether she was properly feeding the child or understood she needed to continuously monitor the child's diaper situation, is evidence that the child could not be safely returned to the mother's care on her own, and we do not find any evidence in the record that the situation can be improved with additional services and time. There is no

doubt that the mother loves the child and wants to be a good caregiver, but the record simply does not show that the mother has the ability to do it by herself.

Ultimately, the mother seems to concede that, with her parents' help, she is able to safely care for the child. Though this is a close call, for the following reasons, we agree with the mother that a guardianship should have been established. And in doing so, we are not critical of the juvenile court, for we have said time and time again that a guardianship is not a legally preferable alternative to termination. *See, e.g.*, *In re N.M.*, No. 17-0054, 2017 WL 1088119, at *3 (Iowa Ct. App. Mar. 22, 2017) (citing *In re L.M.F.*, 490 N.W.2d 66, 67-68 (Iowa Ct. App. 1992)); *In re S.C.*, No. 15-1912, 2016 WL 903029, at *4 (Iowa Ct. App. Mar. 9, 2016) (same); *In re K.B.*, No. 15-1685, 2016 WL 146707, at *4 (Iowa Ct. App. Jan. 13, 2016) (same); *In re C.B.*, No. 14-0704, 2014 WL 3513241, at *2 (Iowa Ct. App. July 16, 2014) (same).

After a termination-of-parental-rights hearing, a number of options are available to the juvenile court. *See* Iowa Code § 232.117. If the court finds the grounds for termination alleged were not established, it must dismiss the termination-of-parental-rights petition. *See id.* § 232.117(2). If the court determines "facts sufficient to sustain the petition have been established," the court can either "order parental rights terminated" or it can "adjudicate the child to be a [CINA] and . . . enter an order in accordance with the provisions of section . . . 232.104." *Id.* § 232.117(3), (5).

Section 232.104(2)(d) sets forth several permanency options for the child's placement, including transferring "guardianship and custody of the child to a suitable person" or transferring "custody of the child to a suitable person for the

purpose of long-term care." *See id.* § 232.104(2)(d)(1), (3). However, the placements enumerated in paragraph (d) can only be ordered if the court first finds that convincing evidence exists showing termination of the parent-child relationship is not in the child's best interests and that the child could not be returned to the child's home even though "[s]ervices were offered to the child's family to correct the situation which led to the child's removal." *Id.* § 232.104(3)(a)-(c).

"As in all juvenile proceedings, our fundamental concern is the best interests of the child." *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). In deciding what is in the child's best interests, we follow the framework established in section 232.116(2), giving "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *See also In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). But, "[e]ven though the court may determine that termination is appropriate under section 232.116(2), the court need not terminate a parent's parental rights if any of the circumstances contained in section 232.116(3) exist." *Id.* These circumstances include a relative having "legal custody of the child" or a determination that termination of the parent's parental rights would be detrimental to the child because of the closeness of the parent-child relationship. *See* Iowa Code § 232.116(3)(a), (c); *see also A.M.*, 843 N.W.2d at 113.

During the CINA case, the DHS case worker and the case service providers, including the CASA and guardian ad litem, voiced no concern with the child's placement in the legal custody of her maternal grandparents. At a

service-provider meeting at the end of August 2016, concurrent placement options for the child were discussed, including creating a guardianship with the maternal grandparents. Despite the child's placement with the maternal grandparents, where she and the mother had lived since February 2016, the DHS recommended that the concurrent placement option be termination of parental rights and adoption of the child, rather than creation of a guardianship, should reunification efforts fail. Notably, the DHS caseworker, the service provider, and CASA each noted in their reports at that time that the maternal grandparents had said they believed the mother was capable of caring for the child on her own. The maternal grandparents had even stated that the mother was the primary caregiver of the child in their home. Nevertheless, there was no suggestion at that time that the child was not safe in the care of the maternal grandparents nor was it recommended that the child be placed elsewhere.

At the May 2017 termination-of-parental-rights hearing, no specific safety concerns were identified about the child's placement with the maternal grandparents. The CASA testified she believed the child was safe with the maternal grandparents with supervision by the court and the DHS, but she expressed there was "emotional turmoil" in the maternal grandparents' home that she believed was detrimental to the child. Although the CASA had not requested a change in the child's placement during the case, the CASA at the termination-of-parental-rights hearing questioned the child's safety with the maternal grandparents, testifying she knew "there was some abuse" in the maternal grandparents' home in the past. However, the social history report stated neither grandparent had "a history of any mental health or criminal behaviors."

Additionally, the maternal grandparents' home had been approved for placement following a home study.

Generally, permanency orders are not preferred over the termination of parental rights. *See L.M.F.*, 490 N.W.2d at 67-68 (citing *In re M.W.*, 458 N.W.2d 847, 850 (Iowa 1990) ("Although Iowa Code section 232.116(2) suggests that the primary consideration in termination cases is 'the physical, mental, and emotional condition and needs of the child,' the legislature, in cases meeting the conditions of section 232.116(1)(e)(1), (2), and (3) (1989), has made a categorical determination that the *needs of a child are promoted by termination of parental rights.*" (emphasis added)). *But see In re S.J.*, 451 N.W.2d 827, 832 (Iowa 1990) ("Termination is an outcome of last resort."). But based upon the facts of the case, including the placement of the child with the maternal grandparents for more than a year without incident or safety concerns, we do not find the child's best interests are served by termination of the mother's parental rights. This is not a case where the child's future placement will remain in limbo if the mother's parental rights are not terminated. The maternal grandparents have been there for the child all of her life and there is no indication that would change if the mother's parental rights are terminated. Similarly, the child's stability and long-term interests will not be affected if the mother's rights are *not* terminated and a guardianship is created. *See also, e.g.*, Josh Gupta-Kagan, *The New Permanency*, 19 U.C. Davis J. Juv. L. & Pol'y 1, 12 (2015) ("Empirical research has demonstrated that options which do not require terminations lead to caregiving relationships that last just as long as traditional adoptions. This continuum of equally permanent options suggests that moving to permanency

should not by default require terminations."); Randi Mandelbaum, *Re-Examining and Re-Defining Permanency from a Youth's Perspective*, 43 Cap. U. L. Rev. 259, 259-60 (2015) ("Federal and state laws mandate that efforts be made to find permanent families for all children placed in foster care, first, by reunifying them with their birth families or, when this is not possible, by securing alternate families through adoption *or guardianship.*" (emphasis added)).

The mother and child love each other and share a close bond. The child also shares a close bond with her maternal grandparents. We agree the evidence shows the mother cannot care for the child alone, but this case is not an ordinary case where there is no parental involvement or addiction issues to overcome. *See, e.g.*, *A.M.*, 843 N.W.2d at 111 (noting the case did "not present any of the usual precursors to termination of parental rights, such as physical or emotional abuse of the child, substance abuse by one or both parents, domestic abuse, parental criminal conduct, or even overt neglect"). This child has a mother that loves her, grandparents in her life, and, at the time of the termination-of-parental-rights hearing, the child was happy and flourishing in the maternal grandparents' care.

Upon our de novo review, considering the matters directed by Iowa Code section 232.116(2), we conclude termination of the mother's parental rights is not in the child's best interests. We also find that two exceptions under section 232.116(3)—specifically paragraphs (a) and (c)—apply to negate the need for termination of the mother's parental rights under the facts of this case. We therefore remand the case back to the juvenile court to enter an order transferring guardianship and custody of the child to the maternal grandparents

pursuant to Iowa Code section 232.104(2)(d)(1). The juvenile court should review this order annually as mandated by section 232.104(7)(a), or more often if needed, to ascertain "whether the best interest of the child is being served." Alternatively, the juvenile court may close the CINA case and transfer "jurisdiction over the child's guardianship to the probate court" as described in section 232.104(7)(b). We affirm in all other respects, and we do not retain jurisdiction.

**REVERSED AND REMANDED WITH DIRECTIONS.**

Vaitheswaran, P.J., concurs; Bower, J., dissents.

**BOWER, Judge** (dissenting).

I respectfully dissent. I would affirm the termination of the mother's parental rights, finding that termination is in the long-term best interests of the child.

I take no issue with the cases cited by the majority and the holding of each case as it relates to those with special needs and those who need additional services in becoming better parents, but I do take issue with the underlying facts of this case and the future stability this child will have if the mother's parental rights are not terminated.

The child's mother is described by those who have interviewed, treated, and counselled her as able to read and understand conversational English at a fourth grade level. The mother is committed to a relationship with the father of the child, who is serving a life sentence for sexual abuse in the first degree for assaulting the child, who was an infant at the time and required several surgeries to repair the child's anus and genitals. The abuse occurred after the mother left the child with the father, who she knew to be drunk. She continues to believe it is acceptable to leave a child with an intoxicated person as that individual could decide how to take care of the child. The mother continues to see the father while he is incarcerated and minimizes his actions. She has even advised others that she does not believe the father committed the offense or at least not to the degree of seriousness with which others have shared. These few statements, directly attributable to the mother, convince me that the majority is wrong. According to the treatment professionals, after specifically tailoring services to

the mother, she can still not care for the child due to her intellectual limits and her beliefs shared above.

What would normally be a termination of parental rights has now become a guardianship with the maternal grandparents. We have continually held and have said time and time again that a guardianship is not a legally preferable alternative to termination. *See, e.g.*, *In re N.M.*, No. 17-0054, 2017 WL 1088119, at *3 (Iowa Ct. App. Mar. 22, 2017) (citing *In re L.M.F.*, 490 N.W.2d 66, 67-68 (Iowa Ct. App. 1992)); *In re S.C.*, No. 15-1912, 2016 WL 903029, at *4 (Iowa Ct. App. Mar. 9, 2016) (same); *In re K.B.*, No. 15-1685, 2016 WL 146707, at *4 (Iowa Ct. App. Jan. 13, 2016) (same); *In re C.B.*, No. 14-0704, 2014 WL 3513241, at *2 (Iowa Ct. App. July 16, 2014) (same). To their credit, the maternal grandparents have helped with the child. However, I cannot look past statements directly attributable to them that their daughter can safely parent this child. In addition to other challenges in their household, including odd working hours and a special-needs adult son who requires regular help, they continue to advocate for their daughter to raise this child on her own at some point in the future. While their statements show loyalty and encouragement, I question their own decision-making. The longer the time the child has with the mother, the more difficult termination will be on all parties, as the bond between all will grow stronger.

Instead of establishing a guardianship in this matter requiring continued efforts, supervision, and court intervention, the child deserves a fresh start with an adoptive family who will provide her with a normal childhood she so deserves, as opposed to providing services to the mother and child until such a time that the child can become more independent.