# IN THE COURT OF APPEALS OF IOWA

No. 21-0686
Filed September 22, 2021

**IN THE INTEREST OF V.W.,**
**Minor Child,**

**K.R., Father,**
　　Appellant.

_____

Appeal from the Iowa District Court for Tama County, Angeline M. Johnston, District Associate Judge.

A father appeals the termination of his parental rights. **AFFIRMED.**

John J. Bishop, Cedar Rapids, for appellant father.

Thomas J. Miller, Attorney General and Chandlor Collins, Assistant Attorney General, for appellee State.

Jane M. White of Jane M. White Law Office, Des Moines, attorney and guardian ad litem for minor child.

Considered by Tabor, P.J., and Greer and Badding, JJ.

**BADDING, Judge.**

A father appeals the termination of his parental rights to his eight-year-old daughter, V.W. Because the father's appeal is limited to the juvenile court's best-interest determination, our de novo review will likewise be confined to that step in the termination process. *See In re A.S.,* 906 N.W.2d 467, 472-73 (Iowa 2018) (stating the standard of review and describing the three-step termination process).

**I.    Background Facts and Proceedings**

The mother and father of V.W. met online. The father, who is from Ohio, came to Iowa for a visit to meet the mother in person. Not long after his visit, the mother informed the father that she was pregnant, only to tell him later that she had a miscarriage. Years later, the father saw a picture of V.W. the mother had posted on a social media site. Thinking that the child bore a resemblance to him, the father questioned the mother about whether he was the father. The mother denied that he was, telling him paternity testing showed her current boyfriend was the father.

"[T]hat was the end of it" for the father, until August 2018 when the Iowa Department of Human Services (DHS) learned that V.W., who was five years old at the time, followed a stranger into a bar. This was not the first time the child or one of her siblings had been found wandering alone. It was also not the first time a report had been made to DHS about the family.

A petition was filed, and all four of the mother's children were adjudicated children in need of assistance. They were removed from the mother's care in September 2019 and placed with their maternal grandmother and her boyfriend. Paternity testing showed that the mother's boyfriend was not the child's father.

DHS then contacted the father, who readily agreed to participate with a paternity test. The results confirmed that he was the child's biological father.

The father immediately became involved in the case, coming to Iowa in December 2019 for a visit with V.W. Unfortunately, that was the first and only time they met in person. DHS ordered an interstate home study for the father at the end of February 2020, but children services in Ohio did not hear from the father until the end of March. The father explained that his phone had been disconnected and that he was homeless and unemployed. The father candidly acknowledged to the Ohio social worker "that he does not have the financial ability to care for himself, or [the child]" and withdrew his request for a home study.

From that point forward, the father's contact with V.W. was limited to phone and video. In September 2020, the father made the decision to discharge his probation for a burglary conviction. He went to prison in Ohio but maintained contact with the child. The father was released to a halfway house in February 2021. He expected that his time at the halfway house would be finished by June, although he would still be on parole in Ohio for a period of time after that. The father was hopeful, however, that he could get his parole transferred to Iowa so that he could care for the child.

The State filed a petition to terminate the mother's and the father's parental rights to the child in October 2020. Because the State initially had some trouble locating the father to serve him with notice of the petition, the juvenile court held a separate hearing in January 2021 to determine whether to terminate the mother's parental rights to all four of her children. The court terminated her parental rights in a ruling filed on April 5, 2021.

After holding a termination hearing on April 16, 2021, the juvenile court terminated the father's rights pursuant to Iowa Code section 232.116(1)(f) (2020). The father agreed at the hearing that V.W. could not be placed in his care, but he requested an additional six months in order to work toward that goal. The juvenile court, however, found that termination was in the child's best interest, reasoning that even after the father's release from the halfway house,

> he will still have to maintain employment, find a place to live, and meet all parole expectations. [The father] has no concrete plans as to how he would provide services for [the child] to meet her needs, or how he would insure she maintained contact with her siblings and her grandmother, who have been the only constant in this little girl's life. [The child] had no structure, no stability, and her behavioral needs were not being met until she was placed with [her grandmother]. [The father] has been on some form of probation supervision since 2015. Love and commitment in a vacuum is not enough. [The child] needs a place to live, a place for therapy, medication services, school services, daycare, structure, and a lot of attention. [The child] knows that her grandmother will provide these things for her. [The father] is a virtual stranger to her.

## II.    Analysis

The only issue the father raises on appeal is whether termination of his parental rights is in V.W.'s best interest. Under this umbrella, however, the father argues "that harm would occur as a result of destroying the current and potential bond" between him and the child, *see* Iowa Code § 232.116(3)(c), and that he should be granted additional time to transition to Iowa. *See* Iowa Code §§ 232.104(2)(b); .117(5). Setting aside any error-preservation concerns, *see In re J.B.L.*, 844 N.W.2d 703, 705 (Iowa Ct. App. 2014), we will combine our discussion of these several claims.

When making a best-interest determination, primary consideration is given to "the child's safety, to the best placement for furthering the long-term nurturing

and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (quoting Iowa Code § 232.116(2)). Where grounds for termination have been established, "the legislature . . . has made a categorical determination that the needs of the child are promoted by termination of parental rights." *In re M.W.*, 458 N.W.2d 847, 850 (Iowa 1990).

Commendably, the father tried his best to become involved in V.W.'s life after having been excluded from it through no fault of his own. He testified that he "never miss[ed] an opportunity to talk to that little girl," sometimes staying on the phone or video with her for hours while she read him books or watched videos with him. The father's love for V.W., and her eagerness to connect with him, were clear. But his efforts to become a parent to her were hampered by his residence in Ohio, incarceration, and finances. The father was open in acknowledging that the child could not be placed with him for at least six months, during which time he would try to transfer his parole to Iowa, find a job, and locate a place to live. This is a tall order to fill, as the juvenile court recognized:

> It is not a stretch to believe that even with the best intentions the struggle of reintegrating into society after prison as a convicted felon, being on parole, and parenting a child with ADHD with whom you have spent virtually no time with would be overwhelming to the most well-grounded of persons much less a person who has struggled with mental health and substance abuse issues.

We agree with the juvenile court that even though the father and the child "feel a bond and connection[,] . . . [i]t is not enough." *See In re L.C.*, 2021 WL 3660871, at *2 (Iowa Ct. App. Aug. 18, 2021) (noting that while the parent-child bond "may play a role in the best-interests determination, . . . it is not the only

consideration"). After many years of instability, V.W. was finally in a structured environment with her grandmother and siblings. She was receiving services and medications to help address the behavior problems she exhibited at home and school. The grandmother intended to adopt V.W. and all of her siblings. Despite the father's best intentions, there was no indication that he would be able to provide the same type of nurturing home for the child—now or in the future.

We accordingly conclude termination of the father's parental rights is in the child's best interests. The juvenile court's ruling is affirmed.

**AFFIRMED.**