# IN THE COURT OF APPEALS OF IOWA

No. 23-0701
Filed July 13, 2023

**IN THE INTEREST OF J.S., P.S., and S.S.,**
**Minor Children,**

**T.K., Mother,**
    Appellant,

**M.S., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Cherokee County, Andrew J. Smith,

District Associate Judge.

The mother and father separately appeal the termination of their parental

rights to three children. **AFFIRMED ON BOTH APPEALS.**

Molly Vakulskas of Vakulskas Law Firm, P.C. Sioux City, for appellant

mother.

Tisha M. Halverson of Klay, Veldhuizen, Bindner, De Jong & Halverson,

P.L.C., Paullina, for appellant father.

Brenna Bird, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

Lesley Rynell, Sioux City, attorney and guardian ad litem for minor children.

Considered by Ahlers, P.J., Badding, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2023).

**POTTERFIELD, Senior Judge.**

The mother and father separately appeal the termination of their parental rights to P.S. (born in 2014), J.S. (born in 2020), and S.S. (born in in 2022). Both parents argue the juvenile court should have granted their motions to bifurcate the permanency and termination hearing as it relates to S.S. Additionally, they both challenge the statutory grounds for termination, whether the loss of their rights is in the children's best interests, and if the strength of the parent-child bond precludes termination. The father also claims the juvenile court lacked temporary emergency jurisdiction to enter the initial removal order for S.S., the Iowa Department of Health and Human Services failed to meet its reasonable-efforts mandate, and he should have been given additional time to work toward reunification with the children.

**I. Background Facts and Proceedings.**

The department became involved with the family in September 2021; the mother admitted the father was using methamphetamine in the family home, and P.S. reported that the parents fought in front of the children, which included the father hitting the mother. Initially, the mother agreed to take the children—just P.S. and J.S. at the time—and keep them from the father as part of a safety plan until further investigation could be completed. But the mother violated the plan multiple times in the following days, and both parents tested positive for methamphetamine. J.S. and P.S. were removed from both parents' care and adjudicated as children in need of assistance (CINA) that same month.

The father incurred a number of criminal charges in Iowa for the September incidents—including child endangerment, harassment, and domestic abuse

assault—and a no-contact order protecting the mother was entered. Then in October, the father picked up charges in South Dakota after it was alleged he intentionally drove his vehicle into the vehicle of some high school students in a store parking lot. And in spring 2022, the father was charged in Minnesota on drug charges. In spite of his legal troubles and in violation of the no-contact order, the mother continued spending time with the father. The no-contact order was eventually lifted at the mother's request.

In May 2022, the mother admitted to using methamphetamine one or two times per month. She later recanted that admission, but a positive hair test in July seemed to confirm its truth. The father tested positive for methamphetamine as late as July 13, 2022.

In July 2022, the mother gave birth to S.S in South Dakota. In its request for emergency removal, the department reported to the court that the parents were homeless at the time, with their last known address being a hotel in Iowa in late June or early July. The department also alleged that "[n]either parent [had] made any progress on their ongoing substance abuse, mental health, or relationship issues." The application was silent on the fact that the child was born and currently located in South Dakota. The juvenile court granted the request, and a department social worker traveled to South Dakota to take custody of S.S.

At a temporary removal hearing on July 22, the father moved to dismiss the CINA proceedings regarding S.S. for lack of jurisdiction. The mother joined the father's motion. In its written ruling denying the motion,[1] the juvenile court noted

---

[1] We do not have the transcript from this hearing.

that the mother emailed the social worker on July 14—before she gave birth to S.S.—and reported she and the father recently obtained an apartment in Sioux Center, Iowa. Shortly thereafter, the mother gave birth to S.S. in South Dakota, where she had received prenatal care. While the mother remained in the South Dakota hospital, the father reported to the department that the mother was living in South Dakota. Neither parent supported this claim with proof of housing in South Dakota. In its ruling, the juvenile court recognized that "[t]he application for temporary removal in this case did not indicate that the child was born in Sioux Falls. No authorities in South Dakota were notified prior to seeking the removal or in order to assist in effectuating the removal, which occurred hours after the birth, at the hospital." Ultimately, the court ruled:

> Clearly, as [S.S.] was not present in Iowa at the time of the removal, jurisdiction pursuant to [Iowa Code s]ection 598B.204(1) would not be appropriate. The proper question, however, is whether Iowa was the appropriate jurisdiction for an initial custody determination pursuant to Iowa Code [s]ection 598B.201. The State bears the burden to make a prima facie showing of jurisdiction. The Court finds that it has met the burden to demonstrate Iowa is the appropriate jurisdiction to make an initial custody determination.

(Citation omitted.) Because the mother was a resident of Iowa and S.S.'s siblings remained in Iowa in foster care, the court concluded Iowa had jurisdiction to make an initial child-custody determination.

On September 12, S.S. was adjudicated CINA. The court outlined the parents ongoing relationship issues and their lack of honesty and forthrightness with providers and the department. The dispositional order followed two months later. Neither parent appealed.

In the meantime, a permanency hearing was held for P.S. and J.S. in September. In its ruling, the court stated:

> The parents were admonished that, given the lack of progress as evidenced in the findings in [the order adjudicating S.S. a CINA], the main reason the Court is willing to grant an additional six months in this case is so the parents have similar timeframes to work toward reunification with all three children. To that end, substantial progress must be made by both parents over the next few months.

On December 14, the court held a permanency review hearing regarding P.S. and J.S. combined with a CINA review hearing regarding S.S. The court found:

> Minimal progress has been made since the last hearing. [The father] has completed inpatient treatment. He is now residing in a sober-living home. The extent of his ability to comply with other services is unclear. [The mother] has been evicted from the apartment in Sioux Center and is now living somewhere in Minnesota which she has not disclosed to [the department], with an uncle. There continue to be issues with her ability to work with service providers. She has started mental health counseling and advises that they are working on coping skills in order to address some of those issues. She was encouraged to continue to follow through with that treatment even when it might get difficult.

The court set a permanency hearing for S.S. on January 11, 2023.

Just a couple days later, the court filed an order stating that there was a scheduling conflict for the January 11 hearing, so the permanency hearing for S.S. would be held in conjunction with the contested hearing already scheduled for March 28.

On February 10, 2023, the State petitioned to terminate both parents' rights to all three children. The same day, the court entered an order that the termination trial would take place on March 28—the date and time already set for a contested hearing.

On March 20—almost forty days after the termination trial was first set—the mother and father each moved to bifurcate the permanency hearing for S.S. from the termination trial. The mother argued holding the permanency hearing and termination trial at the same time "would . . . violate [her] substantive and procedural due process rights, and would not be in the best interests of the minor child." She claimed that any request for additional time to work toward reunification was rendered meaningless when the two proceedings were combined. The father's motion reiterated much of the mother's and added, "Permanency hearings and termination of parental rights hearings have separate and distinct evidentiary considerations and burdens, and the Father's right to due process is violated by not allowing him the opportunity to be heard appropriate to the nature of the case." Additionally, the father stated, "Because the Department has not granted increased visitation voluntarily, [the father] requests that the Court order increased visitation. [He] requests a hearing on increased visitation and on permanency prior to any hearing on a petition for termination of parental rights." The children's guardian ad litem (GAL) resisted the motions; she argued the parents were given adequate notice of the combined hearing, already had a permanency hearing as to the oldest children (and were given additional time then), and it was not in the children's best interests to set the siblings on different permanency timelines.

The juvenile court started the March 28 hearing by asking for arguments for and against the motions to bifurcate. The parents relied on their written motions, and the State joined the GAL's resistance. Ruling orally from the bench, the court denied the parents' motions to bifurcate. The court concluded that no statute or rule prevented the combining of the hearings but noted that it needed to and would

address all of the permanency options under Iowa Code section 232.104(2) (2023) in the ruling following the combined hearing.  And while the prevailing notion was that the two proceedings should generally not be combined, the parents could still ask for additional time to work toward reunification in a combined proceeding, which the court would consider along with whether it should grant the termination petitions.  Finally, noting the parents received a permanency hearing as to the oldest two children, the court determined that not delaying the termination hearing for S.S. was in the children's best interests.

During the evidentiary portion of the combined hearing, the social worker from the department testified that there were no current concerns about either parent's current use of illegal substances.  However, concerns about the volatility of their relationship and each parent's lack of stability remained.  While they were living separately—as required by the father's probation officer—the parents were still in a relationship and planned to continue it in the future.  The parents were not involved in couple's counseling with a licensed professional, although they reported they recently began speaking to their pastor about their relationship.  The social worker noted the parents were unable to set aside the dysfunction in their relationship even for the span of supervised visits with the children and testified about P.S.'s recent report that the mother showed up to a visit crying.  In February, the mother sent text messages to a worker at the sober living home where the father was living, claiming the father took her vehicle, was committing financial abuse, and that her foot was broken and hand cut.  When asked about the incident at trial, the mother testified:

> [The father] brought some furniture to the apartment with his friend. I don't remember what the disagreement was. I wanted his help to move the crib to the—[J.S.] and [S.S.'s] room. He wasn't going to because he didn't—he didn't want to—anything to escalate or anything. So he left.
>
> And I tried to move the crib myself, and I dropped it on my foot. But I was upset because he took the car. And I said, well, what about if I need to go somewhere and I have no transportation? So I called the non-emergency number, not 911, the non-emergency number, and I asked the lady who answered about—I had a question about the car. And she said, would it be easier if I just send an officer out there to talk to you? And I said, yes, that's fine. So she sent an officer out.
>
> And I had explained I have a question about the car. I said I dropped the crib on my foot. I don't think it's broken but it feels like it. But I can move it. And I had a cut on my hand from trying to pull the crib through the hallway. And then he told me what I needed to know about the car because there was nothing that he can do. And that I was correct, as—it's in his name so therefor I don't really have any rights to it or whatever. So he left.
>
> So I was venting my emotional frustration and my anxiety. . . . I don't handle separation very well. And [the father] is all I have. And so when he leaves—and even when he leaves so that there's no— no issues or anything like that, like he did, it causes—it caused me to have almost a panic attack.
>
> And so I was venting to someone on Facebook Messenger because that's what I do when I get upset. I reach out to a known source and I vent.

The worker also testified about the visits and services the parents declined because of the mother's refusal to work with a number of female staff members. The mother complained of staff members flirting with the father or wearing inappropriate clothing.[2]

The father only recently started addressing his mental-health needs—in January 2023. And the mother began mental-health treatment with a new provider

---

[2] In one of the instances where the mother complained, the staff member was wearing the same outfit that she wore to testify at a hearing, and the juvenile court specifically noted that the clothing was appropriate.

in February 2023; she was diagnosed with post-traumatic stress disorder and given a provisional diagnosis of bipolar disorder.

As of the time of the hearing in March 2023, the father was maintaining employment. After completing inpatient substance-abuse treatment in late 2022, he moved into a sober living home. He was required to leave the home for two weeks in December after he tested positive for marijuana, but he returned when he was allowed. Although he could have stayed longer, the father left the sober living community for his own home in March 2023. The State of Minnesota completed a home study and, on March 27, recommended approval of placing the children with the father with several conditions, including he continued "all therapy, counseling, treatment, and drug court" and start unsupervised visits in the home with the children. The report made clear that placement would be based on the Iowa Department of Health and Human Services' approval.

The mother moved to Minnesota after the father entered inpatient treatment there; she was evicted from her home in Iowa once the father was unable to help cover the rent. She lived in a couple different hotels, and the father stayed with her during the two weeks in December he was not allowed to reside at the sober living home. In early February 2023, she moved into a three-bedroom apartment in Minnesota. She was employed at a local daycare.

Referencing the fourteen "factors, conditions, or expected behavioral changes expected to be made by the parents" for reunification to take place, as enumerated by the court in its September 14, 2022 permanency order (regarding P.S. and J.S.), the court concluded the children could not be returned to either parent. The parents had made some progress toward certain expectations,

including refraining from abusing substances and maintaining their own homes. But the dysfunction in the parents' relationship remained. As the court summarized:

> The parents have even been unable to set aside this dysfunction during visitation with the children, which has continued since the permanency hearing. Notes from a September 24, 2022, visit reflect the parents were observed to get frustrated with one another to the extent that [the father] needed to separate himself. During a visit note on September 30, 2022, [the mother] became upset because the Safe Care provider was communicating with [the father] directly, so [the mother] left for a while and the parents subsequently had an argument over the flirting which [the mother] perceived to have occurred. A note from the October 4, 2022, visit reflects that the supervisor perceived that the parents had an argument before the visit resulting in the fact that [the mother] appeared to have been crying and [the father] appeared agitated. During a visit on November 22, 2022, [the father] questioned [P.S.] about changes she saw in the apartment and vehicles she observed in the parking lot. That note and related testimony indicates that the questioning may have been due to [the father's] suspicions about whether [the mother] was cheating on him. A January 6, 2023, note reflects that [the father] was short with [the mother] and appeared to become more irritated throughout the visit. A February 24, 2023, note reflects that, after the parents were followed to Wal-Mart by the visit supervisor, [the mother] remained in the vehicle and had clearly been crying. A March 12, 2023, note reflects that the parents were arguing about whether [P.S.] should have her eyes examined. . . .
>
> While the behavior of the parents during visitation may be a minor concern in other cases, it is telling that the dysfunction of this relationship impacts the parents' visits with their children. Aside from the impact on visitation, it is clear that domestic violence, physical, mental, and economical, persists in the relationship. Testimony reflects that [the father] makes allegations of drug use by [the mother] when he is upset with her. [The mother] continues to rely upon [the father] completely. While she claims not to recognize it, it is clear from the history of their relationship, that [the father] uses his financial and emotional support in a dysfunctional power and control dynamic within the relationship. The evaluation [the mother] completed in February reflects that she admits to having suffered trauma within the relationship.

(Citations to the record omitted.) Additionally, neither parent cooperated with family centered services. Both because of the mother's refusal to work with certain

female providers and because both parents ultimately moved out of Iowa (and could not receive services across state lines), the parents made little progress on the solution-based casework.

As to the permanency ruling for S.S., the court concluded, "The same factors warranting a conclusion that the grounds for termination have been proven and termination is in the best interests of the children weigh against any alternative permanency options with respect to [S.S.]"  The court terminated both parents' rights to P.S. pursuant to Iowa Code section 232.116(1)(f), to J.S. pursuant to section 232.116(1)(h), and to S.S. pursuant to section 232.116(1)(d) and (h).

The parents separately appeal.

**II. Standard of Review.**

We review child-welfare proceedings, constitutional claims, and jurisdictional issues under the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA) de novo.  *In re A.H.*, 950 N.W.2d 27, 33 (Iowa Ct. App. July 22, 2020) (child-welfare proceedings and constitutional claims); *In re J.M.*, 832 N.W.2d 713, 719 (Iowa Ct. App. 2013) (UCCJEA).

**III. Discussion.**

**A. Temporary Emergency Jurisdiction.**

The father asserts we should vacate all orders in S.S.'s case because the juvenile court lacked temporary emergency jurisdiction at the time of S.S.'s removal from the South Dakota hospital.  He relies on Iowa Code section 598B.204 (2022), which deals with temporary emergency jurisdiction under the UCCJEA, noting that the child's presence in the state is necessary to confer jurisdiction.  *See* Iowa Code § 598B.204(1) ("A court of this state has temporary emergency

jurisdiction *if the child is present in this state* and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." (emphasis added)); *see also In re B.C.*, 845 N.W.2d 77, 80 (Iowa Ct. App. 2014) ("[F]or Iowa courts to have any kind of temporary emergency jurisdiction, the child must be present in the state.").

The State concedes that at the time of S.S.'s removal, Iowa did not have temporary emergency jurisdiction. But, as the State recognizes, that does not foreclose the possibility that Iowa properly had jurisdiction for the *termination* proceedings—making the father's requested remedy inappropriate.[3]

Iowa Code section 598B.201 controls jurisdiction for initial child-custody determinations in child custody proceedings.[4] It provides, in part:

> 1. Except as otherwise provided in section 598B.204, a court of this state has jurisdiction to make an initial child-custody determination only if any of the following applies:
> a. *This state is the home state of the child on the date of the commencement of the proceeding*, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.
> b. A court of another state does not have jurisdiction under paragraph "a", or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under section 598B.207 or 598B.208 and both of the following apply:
> (1) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

---

[3] We note the father concedes in his petition on appeal that the State of Iowa may have had jurisdiction for the CINA adjudication.

[4] "Child-custody proceedings" as defined by the statute encompass, among other matters, neglect, abuse, dependency, guardianship, and termination-of-parental-rights proceedings. Iowa Code § 598B.102(4).

> (2) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

Iowa Code § 598B.201(1) (emphasis added).

As termination proceedings and CINA proceedings are distinct actions, the filing of the termination petition is "the date of the commencement of the proceedings." *See id.* § 598B.102(5); *see also In re N.H.*, No. 11-1823, 2012 WL 298899, at *3 (Iowa Ct. App. Feb. 1, 2012); *In re S.W.*, No. 11-0710, 2011 WL 3115841, at *4 (Iowa Ct. App. July 27, 2011). So, the question is whether Iowa was the home state of S.S. on February 10, 2023, when the county attorney filed the termination petition. "'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." Iowa Code § 598B.102(7). And here, S.S. lived with foster parents in Iowa for nearly seven months preceding the filing of the termination petition.

We recognize our published precedent, *B.C.*, 845 N.W.2d at 80, in which this court reversed and remanded the termination of a mother's parental rights based on an incorrect determination by the juvenile court that it had temporary emergency jurisdiction to enter a removal order when the child was not present in the state. In that case, we declined to consider whether the juvenile court had subject matter jurisdiction for subsequent orders because "[f]or purposes of establishing jurisdictional prerequisites, physical presence in this state cannot be premised on a removal order that was improvidently granted." *B.C.*, 845 N.W.2d at 80.

But the present case is different. In *B.C.*, the mother had moved to Illinois two or three months before the child's birth. *Id.* at 79. Without the improper removal of the child from the Illinois hospital and subsequent placement with an Iowa family, there was no reason to believe the child would have been present in the state. But here, the mother was living in Iowa at the time she gave birth to S.S. in South Dakota. The parents contested this fact—maintaining the mother was living in South Dakota at the time of S.S.'s birth—but the mother had recently shown proof of housing at an Iowa address and was unable to show proof of housing anywhere outside of the state. Following a hearing for which we do not have the transcript, the juvenile court ruled:

> [The mother's] own testimony regarding her living arrangements establish that [she] was a resident of Iowa at the time of [S.S.'s] birth. No evidence to the contrary is presented other than [her] self-serving testimony that, despite sleeping in Iowa seven nights a week and having no apparent connection to South Dakota other than a questionable medical card, she considers herself a resident of South Dakota.

In other words, S.S. would have been physically present in this state even without the improper exercise of emergency jurisdiction. Additionally, no other state was the home state of S.S at the time the termination proceedings commenced. *See* Iowa Code § 598B.201(1)(b).

We conclude the court properly had subject matter jurisdiction at the time of the termination proceedings; we deny the father's request for relief.

**B. Bifurcation of Proceedings.**

Both the mother and the father challenge the juvenile court's denial of their motion to bifurcate the permanency hearing and termination trial as it related to

S.S.  Both parents make broad assertions that their substantive and procedural due process rights were violated by the holding of a combined hearing.

Parents involved in CINA and termination cases are clearly entitled to due process.  *See In re K.M.*, 653 N.W.2d 602, 607 (Iowa 2002) ("A person is entitled to procedural due process when state action threatens to deprive the person of a protected liberty or property interest." (citation omitted)).  Procedural due process guarantees "notice and a meaningful opportunity to be heard."  *Id.*  The mother complains that combining the permanency hearing with the termination hearing "rendered a permanency hearing meaningless," while the father complains that "the hearings cannot be held at the same time" so as to afford him "the right to request additional time for reunification."  But the parents could still request additional time to work toward reunification.  *See, e.g.*, *In re C.R.*, No. 18-0592, 2018 WL 2725411, at *1 n.2 (Iowa Ct. App. June 6, 2018) (recognizing the parent has the right to request an additional six months to work toward reunification at the time of the termination hearing).  And in fact, they both did so, and the juvenile court considered their requests and specifically ruled on them.  This is not a case where the court skipped over the permanency options and ruled just on the termination petition.  *See In re J.L.*, No. 20-1546, 2021 WL 1661235, at *3 (Iowa Ct. App. Apr. 28, 2021) (Tabor, J., specially concurring) (recognizing that even when the court combines permanency and termination hearings, "each action requires the juvenile court to make particular written findings").  And the parents had approximately fifty days of notice that the hearing would be combined, so they had time to prepare for both the permanency and termination proceeding.  The combined hearing did not violate the parents' right to procedural due process.  *See*

*In re P.S.*, Nos. 21-0395, 21-0779, 2022 WL 120411, at *2 (Iowa Ct. App. Jan. 12, 2022); *In re K.P.*, No. 14-0122, 2014 WL 2885351, at *3 (Iowa Ct. App. June 25, 2014).

As our supreme court has described it:

"Substantive due process 'forbids the government [from infringing] certain "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" As we have already stated, the parents' fundamental liberty interest in the care, custody and control of their children is affected in termination cases.

Notwithstanding the admitted infringement of a fundamental right, a conclusion that there is a substantive due process violation is not automatic. That is because the Due Process Clause does not protect individuals from all governmental actions that infringe their liberty interests. "'Rather, substantive due process is reserved for the most egregious governmental . . .abuses that "shock the conscience or otherwise offend . . . judicial notions of fairness . . . [and that are] offensive to human dignity."'" *Id.* Thus, the question in the present case is whether the infringement of the parents' fundamental rights is narrowly tailored to serve a compelling state interest or whether the infringement shocks the conscience or otherwise offends judicial concepts of fairness and human dignity.

*K.M.*, 653 N.W.2d at 607 (alterations in original) (citations omitted).

Here, neither parent has offered up an explanation how the combined hearing was not narrowly tailored to serve a compelling state interest or was an egregious governmental abuse that shocks the conscience. In the past, our supreme court has recognized "that the State's interest in providing a permanent home to children in [situations when parents abdicate their responsibility to properly care for their children] and protecting them for further harm are compelling governmental interests." *Id.* (citation omitted). And substantive due process is not offended by termination of parental rights when "one of the 'statutory grounds for

termination . . . [is] established by clear and convincing evidence." *Id.* (alterations in original) (citation omitted).

We recognize that "parental rights are fundamental and terminating parental rights always invokes substantive due process." *P.S.*, 2022 WL 120411, at *2. But the combination of the permanency hearing for S.S. with the termination hearing—when the parents received a separate permanency hearing for the oldest two children about six months before and where they had about fifty days of notice of the combined hearing—did not violate the parents' substantive due process rights.

**C. Statutory Grounds.**

Both the mother and father challenge whether the State proved the statutory grounds for termination. When the juvenile court terminates on more than one ground, we may affirm on any ground we find supported by the record. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We choose to focus on paragraphs (f) and (h), which are similar grounds that cover different age groups and require different lengths of time for removal. *See* Iowa Code § 232.116(1)(f)(1)-(3), (h)(1)-(3). Neither parent contests those grounds. Both the mother and father focus their argument on whether the children could be returned to their care at the time of the termination trial in March. *See id.* 232.116(1)(f)(4), (h)(4); *see also In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

"[I]n termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally." *In re D.G.*, 704 N.W.2d 454, 460 (Iowa Ct. App. 2005). But we recognize these parents remain in a relationship and intend to share in co-parenting these children; "[w]e cannot ignore reality and the extent these parents' lives are intermixed when deciding their

respective legal challenges." *In re G.B.*, No. 22-0438, 2022 WL 1657190, at *4 (Iowa Ct. App. May 25, 2022).

The mother argues the children could be returned to her care because "she was employed, maintaining her own residence, and had all the furniture and household necessities." We recognize these positive strides made by the mother. But they are not determinative as to whether she was ready to take over caring for the children. The mother's job and home were new—they mother had not yet shown she could maintain either. And, even more importantly, the mother only recently re-engaged in mental-health therapy, in spite of the serious role her mental health and the volatility of her relationship with the father played in her inability to provide appropriate care and a safe home for the children. We agree with the juvenile court that the children could not be returned to the mother's care. *See In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) (stating a child cannot be returned home if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication").

The father also challenges whether the State established the children could be returned to his care.[5] The father focuses on his recent positive gains, including

---

[5] The father also claims the department failed to make reasonable efforts at reunification, which—while not "a strict substantive requirement of termination"—impacts the State's "burden of proving those elements of termination which require reunification efforts." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). Specifically, the father challenges reasonable efforts, arguing "no progress with visits occurred."

He maintains error was preserved on his reasonable-efforts argument "as it was argued during the permanency and termination of parental rights hearing." The State contests error preservation, and we agree with the State that error was not preserved. Raising the issue to someone other than the court does not preserve error. *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002) ("[V]oicing complaints regarding the adequacy of services to a social worker is not sufficient. A parent must inform the juvenile court of such challenge."). And first raising the issue to

obtaining his own home, maintaining employment, and his abstention from illegal substances. While we commend the father for these positive strides, the changes were very recent at the time of the termination trial. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("The changes in the two or three months before the termination hearing, in light of the preceding eighteen months, are insufficient."). The father left the sober living house less than a month before the combined hearing; he had not yet shown he could remain sober outside of a structured setting. *See In re G.L.*, No. 21-1970, 2022 WL 951074, at *2 (Iowa Ct. App. Mar. 30, 2022) ("[T]he father still had a long way to go in his treatment before he could begin to reestablish independent housing and demonstrate an ability to remain sober outside the structured environment. . . . Achieving stability in a structured setting is far different than addressing challenges with drug use without that support." (internal citation omitted)). And, as we already stated when discussing the mother's legal challenge, the parents' relationship remained a major safety concern. Despite the fact that the CINA cases opened in September 2021 after the father physically assaulted the mother and then, one day later, chased her and the children—who were all in the car—on his motorcycle, the mother and father had not attended counseling with a licensed professional. The children cannot be safely returned to the father's care.

---

the juvenile court at the time of the termination hearing is too late to preserve error. *See id.* ("In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding."); *see also In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999) ("While the State has the obligation to provide reasonable reunification services, the [parent] has the obligation to demand other, different or additional services prior to the termination hearing."). We do not consider this issue further.

**D. Best Interests.**

Both parents challenge the court's best-interests determination. The mother argues termination is not in the children's best interests because she and the children "share the natural and everlasting bond between a [m]other and child." In considering the best interests of the children, we are required to use the best-interests framework set out by our legislature. *See In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). And that framework does not include the word "bond."[6] *See* Iowa Code § 232.116(2) ("In considering whether to terminate the rights of a parent under this section, the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."). Our legislature "has made a categorical determination that the needs of a child are promoted by termination of parental rights" when the statutory grounds for termination are met. *In re M.W.*, 458 N.W.2d 847, 850 (Iowa 1990). Without more from the mother to dispel this determination, we conclude that termination of the mother's parental rights is in the children's best interests.

The father also challenges best interests; he relies on his position that the children could be returned to his custody and live with him to support his best-interests argument. But, as we have already stated, we agree with the juvenile court that the children could not yet be safely returned to the father. And after approximately eighteen months of P.S. and J.S. being removed and more than

---

[6] Consideration of the bond or close relationship between the parent and children is more appropriate under step three of the analysis, when the court considers permissive factors that may preclude termination. *See* Iowa Code § 232.116(3)(c).

seven months of S.S. being removed, terminating the father's parental rights and allowing these children to achieve permanency is in their best interests. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014); *see also In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a child's best interest" are the child's safety and her "need for a permanent home").

**E. Permissive Factor.**

Both the mother and father claim the parent-child bond weighs against termination.[7] *See* Iowa Code § 232.116(3)(c). The mother does little more than assert a bond exists. "Yet the existence of a bond is not enough." *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021). "The law requires clear and convincing evidence that 'termination would be detrimental to the child at the time due to the closeness of the parent-child relationship.'" *Id.* (quoting Iowa Code § 232.116(3)(c)).

The father makes a strong argument about typical parent-child attachment and the harm that can befall children due to removal from their home and interference with parental ties. However, without more, we will not apply the permissive factor. *See In re A.S.*, 906 N.W.2d 467, 474 (Iowa 2018) ("We may use our discretion, 'based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship.'" (citation omitted)). Without a showing of more specific harm to these children at issue, we cannot say the father has met his burden to prove the benefits of maintaining the parent-child relationship outweighs the need for termination *in this case.* If the father's general proposition that termination of

---

[7] In an expansive reading of the mother's best-interests argument, we treat her claim about "bond" as an argument for the application of a permissive factor.

parental rights harms children is sufficient, no termination would be allowed to stand. Based on the factors of this individual case and the information we have about the children actually at issue here, we are not convinced the parent-child bond should be saved.

**F. Additional Time.**

Finally, the father requests additional time for reunification. In considering the father's request for additional time at the hearing, the juvenile court ruled:

> Ignoring the history of this case, and focusing only on the current circumstances, there is an argument to be made that [the father]should be granted an additional six months to work toward reunification. The focus of the determination not to grant additional time may seem to be on the lack of progress by [the mother]. The Court cannot ignore the history of this case, which indicates that dysfunction is a constant within a relationship that the parents are determined to continue, despite its negative impact on everyone involved, including the children. The parents have been cautioned at virtually every hearing and within every order that the elevation of their relationship to one another over the needs of their children is the primary concern in this case and that they will be measured as a unit so long as they remain in that relationship. The lack of progress of either parent necessarily impacts the relationship and its negative consequences for the children. "The parents' track record in life created the reality they now face." [*In re B.S.*, No. 21-1514, 2022 WL 108566, at *2 (Iowa Ct. App. Jan. 12, 2022)].

We agree with this reasoning and adopt it as our own. We deny the father's request for more time to work toward reunification.

**IV. Conclusion.**

We affirm the termination of the mother's and the father's parental rights to all three children.

**AFFIRMED ON BOTH APPEALS.**